UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Humberto Victornio, Jr. and Rory
Grundhoffer, as co-trustees for the
next-of-kin of Diana Balderas,

    Plaintiffs,

v.

Shawn Hayes, Dan Mocol, and John
Does 1-2, acting in their individual
capacities as Waseca County
correctional officers; and Waseca
County,

    Defendants.

Case No. 18-cv-226 (JNE/DTS)
ORDER

      Diana Balderas died by suicide two weeks after hanging herself in the Waseca County Jail. The trustees for Balderas' next-of-kin filed this action against Waseca County and four jail officials for violating her constitutional rights and wrongfully causing her death. Plaintiffs filed claims under 42 U.S.C. § 1983 and Minnesota common law. Defendants now move for summary judgment on all claims. Alternatively, they argue that if the Court grants summary judgment on the federal claims, it should decline to exercise supplemental jurisdiction and dismiss the state law claim.

      For the reasons stated below, the Court grants Defendants summary judgment on the federal claims but denies Defendants' motion to dismiss for lack of jurisdiction and denies summary judgment on the state law claim. The Court also dismisses the unnamed defendants because Plaintiffs have failed to identify them through discovery.

1

## BACKGROUND

On October 13, 2016, Diana Balderas appeared before the Waseca County Court for a probation violation. Wolf Aff. Ex. 24, at 2. The court ordered Balderas to complete a drug treatment program but remanded her to the Waseca County Sheriff until space in a residential treatment program became available. *Id.* at 21. The court also ordered a psychiatric evaluation. Noel Aff. Ex. 21, at 3. Balderas' son testified that she was crying and very upset after the hearing. Wolf Aff. Ex. 42, at 5:23–24. While a sheriff's deputy escorted Balderas to the jail, she was cooperative, complied with his requests, and did not appear upset. *See* Wolf Aff. Ex. 25, at 15:5–16:8, 17:9–17.

At the jail, Correctional Officers ("COs") Dan Mocol and Shawn Hayes began the intake process. Wolf Aff. Ex. 26. Mocol had Balderas empty her pockets and took her sweatshirt, purse, glasses, and hair tie. Wolf Aff. Ex. 27, at 3:25–4:4. He brought her to the secure part of the jail and completed the booking in the jail office, during which she looked "a little bit upset." *Id.* at 4:5–12, 5:3–4. She told Mocol that she needed her psychiatric medication and that last time she did not have it, she had seizures. *Id.* at 6:11–23, 7:16–19. Mocol allowed her to place a call to get her medications delivered, but she was unable to reach anyone. *Id.* at 16:14–20. Although it was required by jail policy, Mocol did not conduct a medical or mental health screening and did not conduct a full search of Balderas. Wolf Aff. Ex. 30 ("Mocol Dep."), at 60:24–61:7, 115:13–16. This was the jail's practice when booking female inmates. *Id.* Because the Waseca County Jail was not licensed to hold women, female inmates would always be transferred to another

facility after arrival. Wolf Aff. Ex. 15, at 1; Wolf Aff. Ex. 45 ("Kanewischer Dep."), at 17:22–18:3.

After this abbreviated booking process, the COs put Balderas in the jail's recreation room at 2:15 PM. Mocol Dep. 41:15–17; Noel Aff. Ex. 7 ("Rec Room Video"). While she was in the recreation room, Mocol contacted the Steele County Detention Center to determine if it could house Balderas. Wolf Aff. Ex. 26. The sergeant on duty said the facility would not accept Balderas because they had to take her to the hospital the last time they had housed her. *Id.* Mocol then called the Blue Earth County Jail, where the sergeant on duty agreed to house Balderas. *Id.* When the jail's administrator, Tim Kinniry, arrived to transport Balderas to the Blue Earth County Jail, Mocol sent Hayes to the recreation room to get Balderas. *Id.* At 2:50 PM, Hayes found Balderas hanging by a shoestring. *Id.*; Rec Room Video. She was transported to the hospital where she later died on October 30, 2016. Wolf Aff. Ex. 36.

Shortly before Hayes found Balderas, he documented that he had completed a check of all cells at 2:40 PM. Noel Aff. Ex. 9, at 2. However, he had not checked on Balderas in the recreation room. Mocol Dep. 39:2–8. Mocol later testified that cell checks like these could reduce the likelihood of an inmate's suicide. *Id.* at 120:15–18.

As Balderas' probation officer noted in a probation violation report, Balderas had a history of mental illness and substance abuse and had made statements of suicidal ideation to mental health professionals. Wolf Aff. Ex. 5, at 3. In a July 20, 2016 chemical health assessment, she reported that she had thought about ending her life in the past month. Wolf Aff. Ex. 12, at 6. During a psychological assessment on September 2, 2019,

she stated that she had thoughts of death, but not often, and that she would not hurt herself because she had children at home. Wolf Aff. Ex. 13, at 3–4. Based on this assessment, she was diagnosed with major depressive disorder and generalized anxiety disorder. *Id.* at 5.

During a September 7, 2016 chemical health assessment, she reported that she had thought about ending her life in the past two to twelve months. Wolf Aff. Ex. 17, at 6. While in custody at the Steele County Jail before her probation violation hearing, jail staff referred her to a nurse for a mental health evaluation after she presented behavioral abnormalities and was not coming out of her cell. Wolf Aff. Ex. 18. During a mental health clinical interview on September 14, 2016, she reported feeling depressed, but denied any thoughts of self-harm. *Id.* at 2. On September 15, 2016, Steele County Jail staff called an ambulance that took Balderas to the hospital because she was hyperventilating and reported severe chest pain. Wolf Aff. Ex. 20. Mocol learned about the issues Balderas had at the Steele County Jail when he spoke with that jail's staff on October 13, 2016. Mocol Dep. 73:5–74:3; Wolf Aff. 26, at 1.

After Balderas' death, the jail received a citation from the Department of Corrections ("DOC") for not having a written suicide prevention policy, as required by DOC regulations. Noel Aff. Ex. 18, at 2; Minn. R. 2911.1900. On October 31, 2018, Administrator Kinniry acknowledged that the jail still did not have one in place. Wolf Aff. Ex. 28 ("Kinniry Dep."), at 44:2–45:16.

The jail's policies and DOC regulations required a medical and mental health screening for all inmates, even those that would only be held for a short time. Noel Aff.

Ex. 1 ("Waseca Jail Manual"), at 15; Minn. Stat. § 641.15, subd. 3a; Minn. R. 2911.2525, subpart 1.E. However, jail staff had a practice of not conducting those screenings for women. Mocol Dep. 60:24–61:7. If female inmates were cooperative, COs would have them wait in the jail's recreation room for transport. *Id.* at 11:22–25. Mocol testified that he was trained to do abbreviated bookings for female inmates. *Id.* at 118:8–14. Waseca County Sheriff Bradley Milbrath also acknowledged that the jail did not complete a medical or mental health screening for female inmates. Wolf. Aff. Ex. 23, at 27:2–16, 35:4–36:4. Other jail and county officials similarly confirmed this practice. *See* Kinniry Dep. 46:23–49:3; Kanewischer Dep. 17:22–18:3; Wolf Aff. Ex. 43, at 13:15–16:15 (CO Anderson). Mocol testified that one goal of the medical and mental health screenings was to prevent inmate self-harm. Mocol Dep. 101:4–8.

The jail policies also required a search for all bookings, which included taking an inmate's belt and shoelaces. Waseca Jail Manual 17–18. The jail policies identify preventing self-harm as a goal of these searches. *Id.* at 18 ("Subject will remove all jewelry, empty all pockets and remove belt, shoes and any articles of clothing that could be used by the subject to inflict harm on themselves, other detainees, or facility staff."). Mocol and other officials testified that a goal of the search was to prevent self-harm and agreed that shoelaces are one of the most obvious tools that can be used for self-harm. Mocol Dep. 114:16–115:10; Kinniry Dep. 56:1–57:12; Kanewischer Dep. 15:15–24.

The day after Balderas hung herself, Kinniry sent an email to all staff reminding them to remove inmates' shoes: "ANYONE, that is placed in the Recreation room, or attorney room, or holding cell, make sure they DO Not have their shoes or belt." Noel

Aff. Ex. 20, at 000446. He also reminded staff to complete cell checks and account for every inmate, noting, "Everyone is doing a good job, I'm just reminding everyone to cover your butt." *Id.* Despite this warning, as of May 30, 2018, Deputy Sheriff Kanewischer wrote to Kinniry that when doing cell checks, COs "should be [a]t least looking in the cell and not walking looking straight ahead as some were doing." *Id.* at 000448.

The Hennepin County Court appointed Balderas' son, Humberto Victorino Jr.,[1] and the father of two of her children, Rory Grundhoffer, as co-trustees for her heirs and next-of-kin. *See* Compl. Ex. A; Am. Compl. ¶ 4. In January 2018, they brought this action against Hayes, Mocol, and two unnamed jail staff under § 1983 for violations of the Eighth and Fourteenth Amendments. They also raised a failure to train claim against Waseca County under § 1983. In October 2018, Plaintiffs amended their complaint to include a wrongful death claim under state law against all defendants. All defendants now move for summary judgment on all claims. They also move under Rule 12(b)(1) for dismissal of the state law claim for lack of subject matter jurisdiction.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury

---

[1] In the text of the Complaint, Plaintiffs spell Balderas' son's name "Victorino" but in the case caption of the Complaint, they spelled his name "Victornio." The spelling in the case caption appears to be a mistake. *See* Complaint Ex. A (order appointing Humberto Victorino Jr. as trustee for Balderas).

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). In determining whether summary judgment is appropriate, a court views the record and all justifiable inferences in favor of the nonmoving party. *Liberty Lobby*, 477 U.S. at 255.

## DISCUSSION

### I. Unnamed Officers

Defendants asserted claims against two unidentified correctional officers. Am. Compl. ¶¶ 143–52. A complaint may be filed against unknown officials until the plaintiff has had an opportunity to ascertain their identity through discovery. *See Perez v. Does 1-10*, 931 F.3d 641, 646 (8th Cir. 2019). Because discovery has closed and Plaintiffs failed to identify the unnamed defendants, John Does 1 and 2 are dismissed from this action.

### II. Section 1983 Claims

To prove their § 1983 claims, Plaintiffs must show that Defendants acted under the color of state law and deprived Balderas of a right, privilege, or immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Hott v. Hennepin Cty.*, 260 F.3d 901, 905 (8th Cir. 2001). Plaintiffs alleged violations of the Eighth and Fourteenth Amendments. Although the Eighth Amendment only applies to convicted prisoners, the Fourteenth Amendment provides Eighth Amendment protections to pre-trial detainees.

7

*Hott*, 260 F.3d at 905. As a pre-trial detainee, Balderas was therefore entitled to Eighth Amendment protections from conduct by state officials.

Mocol and Hayes argue that they are entitled to qualified immunity, which insulates state actors from civil liability unless they violated a clearly established constitutional or statutory right. *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000). Plaintiffs raise two theories to prove that Mocol and Hayes violated a clearly established constitutional right: failure to provide adequate medical treatment and failure to protect from a substantial risk of harm. *See Olson v. Bloomberg*, 339 F.3d 730, 735 n.6 (8th Cir. 2003) (describing how these two theories apply in a jail suicide case). Additionally, they bring a failure to train claim against Waseca County. Because a failure to train claim requires an underlying constitutional violation by an individual, the court will first decide if Mocol and Hayes are entitled to qualified immunity. *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007).

To defeat Mocol and Hayes' claim to qualified immunity, Plaintiffs must prove two things: that Defendants violated a constitutional right and that this right was clearly established at the time of the violation. *See Sexton*, 210 F.3d at 909. A district court may decide the order in which to apply this two-pronged test. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). Although it is "often beneficial" to first consider whether a constitutional right has been violated, a court may begin the analysis by determining whether the right was clearly established. *Id.* at 236. When determining the appropriate order of analysis, a court should avoid speculating about difficult constitutional questions when doing so is unnecessary to the outcome of the case. *Id.* at 239–40; *see also Bond v.*

*United States*, 572 U.S. 844, 855 (2014) ("[T]he Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

    a. **Failure to Provide Adequate Medical Care**

In a jail suicide case, jail officials violate the Eighth Amendment for failing to provide adequate medical care if they know that an inmate presents a substantial suicide risk and fail to respond reasonably. *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003). The officials must have actual knowledge of facts evidencing a substantial suicide risk and infer that the prisoner presents a risk. *Id.* It is insufficient for a plaintiff to show that the official should have known of a significant risk. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). Rather, the plaintiff must show that the officials "acted in deliberate indifference to the risk." *Luckert v. Dodge Cty.*, 684 F.3d 808, 817 (8th Cir. 2012). If the risk is obvious, a plaintiff may use circumstantial evidence to infer actual knowledge. *Coleman*, 349 F.3d at 538. A court must consider "the particular risk of suicide posed by the specific prisoner, rather than the generalized threat of suicide among the population of prisoners as a whole." *Hott*, 260 F.3d at 905.

Plaintiffs identify several reasons that Mocol and Hayes must have known about Balderas' suicide risk. First, in Balderas' July 20, 2016 and September 7, 2016 chemical health assessments, she mentioned suicidal thoughts she previously had. Balderas' probation officer mentioned these thoughts in her probation report to the Waseca County Court. Second, Balderas was diagnosed with major depressive disorder and generalized anxiety disorder on September 2, 2019. Third, she behaved in an unusual manner and reported feeling depressed while in the Steele County Jail on September 14 and 15, 2016.

Mocol learned about these episodes when he called the Steele County Jail to see if it had space for Balderas. Fourth, her mood was glum on the day of her probation hearing and subsequent admission to the jail. Mocol described her mood as "a little bit upset" and her son testified that she was crying and very upset after the hearing. Fifth, Mocol knew that Balderas did not have the psychiatric medication she needed. Finally, Plaintiffs argue that the COs should have conducted a medical screening and therefore should have known about Balderas' suicide risk.

Defendants do not dispute these facts but argue that they are insufficient to find that Mocol and Hayes must have known that Balderas had a substantial risk of suicide. They argue that she had denied having suicidal thoughts, reported having a strong faith, and did not tell the COs that she had a substantial suicide risk.

No reasonable jury could find that Mocol and Hayes knew or must have known that Balderas had a substantial suicide risk. Even if they had read the probation officer's report during intake, it indicated a past risk of suicide, not a current one. Although Mocol knew that Balderas was on psychiatric medications, had a gloomy affect, and had mental health issues, none of these facts show actual knowledge of a suicide risk. Balderas told him the medications would prevent seizures, which would not reasonably lead him to suspect a risk of self-harm. Even if Defendants should have known about the risk, that alone is insufficient to prove actual knowledge.

Because there was no constitutional violation for failure to provide adequate medical care, the Court will not consider whether the violation alleged was clearly established. *See Pearson*, 555 U.S. at 242.

### b. Failure to Protect

Under a failure to protect theory, the plaintiff must show that jail officials had actual knowledge of and were deliberately indifferent to a general risk of serious harm, which can include the risk of suicide. *See Hott*, 260 F.3d at 906. Unlike the inadequate medical care theory, this theory can be supported by facts showing that an inmate faced excessive risk of harm because all prisoners in her situation faced such a risk. *Id.* Jail officials face liability if they fail to respond reasonably to an excessive risk. *Id.*

In *Hott*, the court noted that a jail official's deliberate indifference to a known risk of suicide among the general population of inmates could be the basis for a failure to protect claim. *Id.* The plaintiffs argued that a jailer's failure to conduct cell checks every half hour amounted to deliberate indifference of a substantial risk of suicide. *Id.* The court found that although a jury could infer that the jailer knew that one purpose of the cell checks was to prevent suicide, the plaintiff failed to show a substantial risk of suicide among all inmates. *Id.* at 907.

Since *Hott*, the Eighth Circuit has neither considered this theory nor found that it supports finding a constitutional violation in a jail suicide case. *See A.H. v. St. Louis Cty.*, 891 F.3d 721, 726–27 (8th Cir. 2018) (considering an Eighth Amendment jail suicide claim only on a theory of inadequate medical care); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 (8th Cir. 2018) (same); *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006) (same); *Coleman*, 349 F.3d at 538 (same). Rather than use the limited judicial precedent to speculate whether a constitutional violation occurred, the Court will begin analysis by determining if the right allegedly violated was clearly established.

A right is clearly established if "every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotations omitted). The right must have a "clear foundation in then-existing precedent" and must clearly prohibit the official's conduct "in the particular circumstances before him." *Id.* at 589–90. "The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotations omitted). This standard does "not require a case directly on point," but the question must be "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The right Mocol and Hayes allegedly violated here was not so clearly established that a reasonable officer would know the conduct was unlawful. While *Hott* notes that failing to protect inmates from a heightened risk of suicide could amount to an Eighth Amendment violation, it does not identify what establishes a substantial risk or how an officer must respond. 260 F.3d at 907. In fact, the court in *Hott* concluded that a failure to conduct cell checks did not amount to a deliberate indifference to the prisoner's needs. *Id.* at 908. Furthermore, the Supreme Court has held that there is no Eighth Amendment right to adequate suicide prevention protocols. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). Based on this holding, a reasonable officer would not expect that he was constitutionally required to take specific actions because of the general risk of inmate suicide. The controlling legal precedent does not put the question of what an officer must do to protect all inmates from the general risk of suicide beyond debate.

Therefore, because the right allegedly violated was not clearly established, the Court does not need to decide if a constitutional violation occurred. *See Pearson*, 555 U.S. at 242. Mocol and Hayes are entitled to qualified immunity on the § 1983 claims.

### c. Failure to Train

A municipality is only liable for failure to train under § 1983 "where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Because there is no underlying constitutional violation, Waseca County cannot be held liable under § 1983 for failure to train. *Whitney*, 887 F.3d at 861 ("[A]bsent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City.").

### III. Supplemental Jurisdiction

Defendants argue that because the § 1983 claim fails, the Court should decline to exercise jurisdiction over Plaintiffs' state law claim and dismiss the case under Rule 12(b)(1). When deciding whether to exercise supplemental jurisdiction, a court should consider the stage at which the federal claims were disposed of, "the difficulty of the state claim, the amount of judicial time and energy already invested in it, the amount of additional time and energy necessary for its resolution, and the availability of a state forum." *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1346 (8th Cir. 1980). After considering these factors, including the judicial time invested in this case, the Court will exercise supplemental jurisdiction.

### IV. Wrongful Death Claim

Defendants raise two defenses to Plaintiffs' wrongful death claim. First, Mocol and Hayes argue that they are entitled to a common law immunity for state officials. Second, Waseca County argues that it is entitled to statutory immunity for public entities. Alternatively, all Defendants argue that even if the immunities do not apply, they had no duty to protect Balderas from the risk of suicide while she was in their custody.

#### a. Public Official Immunity

Official immunity protects public officials from liability when they are performing discretionary duties. *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). A discretionary duty requires "individual professional judgment that necessarily reflects the professional goal and factors of a situation." *Id.* While exercising discretion, an official cannot be liable for tort claims unless he willfully or maliciously causes harm.

By contrast, an official is not immune from suit when she fails to perform a ministerial duty that does not require discretion. *Id.* An official's actions are ministerial if a policy sets a "sufficiently narrow standard of conduct" that gives the official a duty to engage in that conduct. *Mumm v. Mornson*, 708 N.W.2d 475, 491 (Minn. 2006). A protocol that requires specific conduct, even if unwritten, can establish a ministerial duty. *See Anderson v. Anoka Hennepin Ind. Sch. Dist. 11*, 678 N.W.2d 651, 658–59 (Minn. 2004). When a policy instructs an official to act using mandatory language, it suggests that the official's acts are ministerial. *See, e.g.*, *Mumm*, 708 N.W.2d at 492. (holding that a policy commanding that police "shall discontinue" a pursuit creates a ministerial duty). In a recent case interpreting Minnesota's official immunity law, the Eighth Circuit found

a statute requiring jail officials to provide "suitable shoes" established a ministerial duty. *DeLuna v. Mower Cty.*, 936 F.3d 711, 719 (8th Cir. 2019).

Here, state law and jail policy established unambiguous duties that Mocol and Hayes did not follow. DOC regulations use mandatory language, requiring that every state corrections facility "*shall* have written policies and procedures" that provide for an initial medical screening upon admission. Minn. R. 2911.2525, subpart 1 (emphasis added). Similarly, the jail's policy manual states: "The correctional officer *will* . . . complete a medical screening." Waseca Jail Manual 15 (emphasis added). State law requires that each county "*shall* use a mental health screening tool" for new admissions. Minn. Stat. § 641.15, subd. 3a (emphasis added). The jail policies reflect this mandate: "A mental health screening form *will* be completed." Waseca Jail Manual 15 (emphasis added).

Defendants argue that Mocol and Hayes exercised discretion while admitting Balderas to the jail. Administrator Kinniry testified that the jail's policies were developed to allow staff discretion. Kinniry Aff. ¶ 5. Female inmates could not be subject to the standard policies, Kinniry asserts, because it would be inappropriate in many cases. *Id.* ¶ 6. Plaintiffs disagree because the policy manual contemplates procedures that allow jail officials to conduct searches of female inmates. *See, e.g.*, Waseca Jail Manual 14 ("In the case of a female arrest, a female staff person may be called into the jail to perform a pat down search.").

Regardless of the extent to which officers may exercise discretion when booking inmates, the policy manual and state law unambiguously required the officers to conduct

a search, medical screening, and mental health screening. These mandates established ministerial duties that Mocol and Hayes did not fulfill. Therefore, they are not entitled to official immunity.

### b. Public Entity Immunity

A municipality is generally subject to tort claims unless it can show that the challenged conduct arose from discretionary functions or duties. Minn. Stat. § 466.03, subd. 6; *Conlin v. City of St. Paul*, 605 N.W.2d 396, 402 (Minn. 2000). The Minnesota Supreme Court has found that planning-level government decisions are discretionary and entitled to statutory immunity, but operational decisions are not. *Id.* Planning-level decisions involve public policy and balancing social, political, or economic policy objectives. *Nusbaum v. Blue Earth Cty.*, 422 N.W.2d 713, 722 (Minn. 1988). Operational decisions involve the "day-to-day operations of the government." *Conlin*, 605 N.W.2d at 400. However, "decisions regarding the placement of inmates and patients, and decisions regarding how much liberty to afford them, are protected policy decisions immune from suit." *Johnson v. State*, 553 N.W.2d 40, 47 (Minn. 1996) (emphasis omitted); *see also Norton v. Cty. of Le Sueur*, 565 N.W.2d 447, 451 (Minn. Ct. App. 1997) (holding that a mental health worker was immune from suit for deciding not to follow suicide-prevention protocols because the decision involved weighing an inmate's liberty interests).

Here, Plaintiffs challenge the jail's decision to conduct an abbreviated booking for female inmates. This decision did not involve balancing inmates' liberty interests or determining how restrictive the setting should be for women in the jail. Instead, the jail chose not to conduct required booking practices on women because they were only held

16

for a short time. Furthermore, the county has not shown that it made a public policy decision to conduct abbreviated bookings for women. Kinniry's affidavit only explains general considerations involved in drafting the jail's policy manual, not the specific reasons the jail adopted the abbreviated booking practice for women. *See Conlin*, 605 N.W.2d at 403 (requiring a municipality to establish specific reasons, not merely generalized concerns, to qualify for statutory immunity). Therefore, Waseca County has not met its burden to establish statutory immunity.

### c. Defendants' Duty of Care

To prove a wrongful death claim, Plaintiffs must show that "(1) the defendant had a duty, (2) the defendant breached that duty, (3) there was a death, and (4) the breach of duty caused the death." *Stuedemann v. Nose*, 713 N.W.2d 79, 83 (Minn. Ct. App. 2006). Whether a duty existed is a question of law for the Court and the remaining elements are fact issues appropriate for a jury. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn. 1985). A jailer owes a general duty to protect detainees from reasonably foreseeable harms. *Sandborg v. Blue Earth Cty.*, 615 N.W.2d 61, 63–64 (Minn. 2000). To determine whether a harm is foreseeable, Minnesota courts consider "whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Foss v. Kincade*, 766 N.W.2d 317, 322–23 (Minn. 2009).

Citing *Sandborg*, Defendants argue that because Balderas' risk of suicide was unknown, it was not reasonably foreseeable. However, *Sandborg* does not stand for the proposition that a jailer only has a duty to prevent suicide when he knows about an inmate's particular risk. Rather, *Sandborg* recognized that a jailer has a general duty to

17

protect detainees from harm and held only that Minnesota's comparative fault statute should not apply when a jailer knows of an inmate's suicide risk. *Id.* at 65. It did not limit jailers' negligence liability to situations where they actually know about a particularized risk of harm.

Minnesota law requires county jails to establish suicide prevention procedures. *See, e.g.*, Minn. Stat. § 641.15, subd. 3a (requiring a mental health screening); Minn. R. 2911.1900 (requiring "a written suicide prevention and intervention plan"); *Id.* 2911.2525, subpart 1.E (requiring a medical screening). In fact, DOC cited the Waseca County Jail for failing to have a written suicide prevention policy. Additionally, the jail's policies require all inmates to undergo a search that involves removing shoes and "any articles of clothing that could be used by the subject to inflict harm on themselves." Waseca Jail Manual 17–18. The purposes of these policies are to "provide a safe and secure environment for all staff and detainees." *Id.* at 17. Several officials testified that a goal of searches was to prevent suicide. Because state law and the jail policies require these safety practices for everyone, they suggest that inmate self-harm is foreseeable.

In this case, Defendants had a legal duty to follow the suicide-prevention protocols, including required screenings and searches, to protect inmates from harm. This conclusion is consistent with the Eighth Circuit's holding that jail officials had a duty to provide suitable shoes to an inmate as required by Minnesota law. *DeLuna*, 936 F.3d at 716. At trial, Plaintiffs must prove that Defendants breached the standard of care and caused Balderas' death. *See Sandborg*, 615 N.W.2d at 65 ("[T]he fact that the suicide occurred is not sufficient to impose liability. The plaintiff must still prove that the jail

18

breached the reasonable standard of care. The jury may find that the actions the jail took constituted reasonable care under the circumstances.").

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Dismissal and/or Summary Judgment [ECF No. 22] is GRANTED IN PART AND DENIED IN PART,

    a. summary judgment is GRANTED on the federal claims and DENIED on the state claim, and

    b. dismissal for lack of subject matter jurisdiction is DENIED;

2. Defendants John Does 1-2 are DISMISSED WITH PREJUDICE; and

3. Counts 1, 2, 3, and 4 are DISMISSED WITH PREJUDICE.

Dated: November 8, 2019

s/ Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge